I have a case which is U.S. v. Washington Good afternoon, your honors. My name is Mark Greenberg. I'm the counsel for the appellant. I would like to reserve three minutes in rebuttal. Your honors, there are three issues in this case. There's the Armstrong issue as to whether or not Armstrong applies in a selective enforcement claim discovery request. There is the ineffectiveness of the counsel allegation where trial counsel elicited the defendant's drug conviction in front of the jury. Help me with that. I'm not really clear how that came out on the cross. What exactly was the question that brought out that information? Trial counsel was trying to show that the agents were in violation of the manual, the ATF manual, regarding who should be subjected to an investigation for these phony stash house robberies. And basically, trial counsel misread the defendant's prior criminal history and ultimately showed not only did the defendant not have a crime of violence that was to the knowledge of the agents before he was investigated, but also tried to elicit the fact that he had not been convicted of a drug offense. But on cross-examination, the agent said, well, I think he has a drug offense. But ultimately, that opened the door for the prosecutor on redirect examination to bring out the fact that Mr. Washington had a prior drug conviction. So basically, Your Honor, the jury heard that twice. They heard it when the agent alluded to it on cross-examination. I think he has a drug conviction. And it was affirmed on redirect examination where the prosecutor brought out the fact that he, in fact, did have a prior drug conviction. Did you have any collateral relief to address those issues? Collateral relief? Well, Your Honor, this particular issue comes before the court because there was an allegation that trial counsel had been consuming alcohol during the preparation of trial and at the trial itself. So both the government and defense counsel, myself, spoke to the district court, and we both agreed that it would be appropriate to have a hearing on whether or not trial counsel's consumption of alcohol before and at trial prejudiced the defendant. What happened was that as a result of that, we had a full-blown hearing. The prosecutor testified. Mr. Washington testified. And then the trial judge rendered an opinion, finding that Mr. Washington had not been prejudiced by trial counsel's blunder. But the point is that we do have a full record as to the factual basis for the ineffective assistance of counsel. And as the court well knows, generally speaking, you do not have issues of ineffective assistance of counsel or direct appeal. But when there is a full record that the court can consider, then it's appropriate to consider that particular issue. Okay. And you mentioned three points. The third point? The third point is whether or not the district court was bound to impose the enhanced 20-year mandatory minimum sentence. And I set it for this court, a district court opinion that came out of our circuit in United States v. McLean, where the district court- You mean bound because he was required to impose a mandatory- Correct. That's correct, that he was bound to impose a mandatory 20-year enhanced sentence. This case originally involves 10 kilograms of cocaine that had been created by an ATF in order to induce these individuals to engage in this phony stash house robbery. Bound because of the guidelines or bound because this was fictitious? Bound because it was a mandatory minimum, because it involved 10 kilograms in the case. Bound because of that, not because the cocaine was fictitious. No, no. I think it was basically- Under the guidelines it was more than 5 kilos. Well, under the statute it was more than 5 kilos. The 851 statute, which basically- Well, under 854, a person who is convicted of conspiring to distribute or attempt to distribute 5 kilograms or more of cocaine is looking at a mandatory 10 years in jail. Under 851, if you have a prior conviction, which Mr. Washington did, it then goes up to 20 years in jail, mandatory. My position was in the district court that because the ATF had unbridled discretion to manipulate the quantity of cocaine, that that basically was something that Congress did not intend when it passed the mandatory sentencing of 10 years, and certainly not with respect to where you have a double of that mandatory minimum sentence because of a prior drug conviction. But the court said, no, I'm bound to impose the mandatory minimum sentence, which is 20 years here, on the drug offenses. So, with No. 1 under- Putting that aside, let's take and focus on the Seventh Circuit, which is under Davis. What was the threshold showing that you made to alert to the district court of the fact that there may well be a discriminatory practice in whose pursuit for these stash houses, such that it would be justifiable to allow you to engage in back-ended discovery? Was there any kind of threshold showing you did allege that since 2009, there have been four stash house prosecutions that you knew of, that all those defendants had been black? That's correct, 100%. Okay. And in Davis, it was not 100% black. It was 91%, but that was- Well, there was a 91% that Mr. Washington included an article from USA Today expose of drug house stash robberies, fictitious ones, nationwide, and 91% of those involved minorities, whether they be African American or Hispanic. So, when you take into account that 100% of the defendants in our district- They were known to you. That were known to Mr. Washington because they were 100% of them, or more African American, all 20 of them. 100% of those, plus when coupled with a nationwide statistic of 91% African American or Hispanic, I believe that that made a sufficient showing to get to the discovery aspect of it to inquire more. Wasn't that made in terms of the Armistrong inquiry for selective prosecution, as opposed to selective enforcement? Well, it was initially styled selective prosecution, but as the district court pointed out, in fact, it was a selective enforcement claim. And when Mr. Washington went back on a motion for reconsideration after the district court denied his request, Mr. Washington incorporated the selective enforcement component of that. So, the district court knew what this case was all about. It was a selective enforcement case. Well, let me ask you, how does Mr. Washington have standing to forward a selective prosecution case when he wasn't picked up by any DEA agent? He was enlisted by a co-conspirator who, I don't know whether he was black or white, but he was not solicited and he did not agree to go to this based on any government overture to him. He was told by a co-conspirator. So, where does he have the ability to come into court and say, I've been figured by the government because I'm black? He was not figured by anyone in the government. He was figured by a co-conspirator. Good question. Davis addresses that question. I didn't see the answer that he addressed. Oh, yeah, absolutely. I mean, I read it, but what sense does it make? He doesn't have the ability to say I was discriminated against because the government never did anything to him. But that's the entire point of the selective enforcement matter. If Mr. Washington was white, Mr. Washington has a right to show that the ATF may not have pursued him because of the fact that he was white. And that's the point that Davis makes. Well, yeah, but the ATF didn't pursue him because he was black. The ATF, the government didn't pursue him at all. His co-conspirator did and brought him into the whole show. Well, that's an accurate rendition of the facts. But then the question that it becomes is, would the ATF have pursued the investigation if, in fact, Washington was white and his co-conspirator was white? Well, when the government opened this investigation, as far as I could understand the briefing, Washington was not in the question. They had this pretend snatching house and they solicited a few cooperative witnesses and one of the co-conspirators enlisted him. But he was never figured by the government. The government didn't look at him and say you're a likely suspect here because you're black or whatever. Therefore, I'm going to prosecute you. They didn't determine to go ahead with this in the first place because of him at all. They didn't know he existed until after he enlisted with co-conspirators. Barry is the one who enlists Mr. Washington in this conspiracy, the co-defendant Barry. Yes. That's the same issue that was raised in Davis because the government made the same point that this court is now making. That is because the co-conspirators solicited Bowden. That was the name of the defendant in Davis. That explains away the fact that there might have been selective enforcement. But the Court of Appeals in Davis said that doesn't necessarily mean that the defendant there would have been investigated had he been white. That's the same thing in Mr. Washington's case. I thought, Mr. Greenberg, that Davis was particularly egregious in involving 20 cases and involving 88 black and Hispanic defendants out of 94. This case is really a very small sampling, four cases, one of which is your case. Why is Davis particularly helpful to you? Because it sets out the framework of measured steps that can be taken for the district court to allow or consider the discovery request. You, in fact, did get some discovery in this case. They're asking for this type of discovery. We received a manual, a portion of a manual that was used on cross-examination, but it was not used in connection with the discovery request. The point here is that had Mr. Washington been presented with that particular manual or additional discoveries, because, for example, the- I think what you're going to say, had he been presented with that manual. Go ahead. Had he presented with that manual, that would have provided some information that he could have then looked at to say, additional discovery is warranted here. And that additional discovery very well might have been other circulars. Do you think that manual would have disclosed selective enforcement, the type which seems to be what you're looking for? Well, the manual was something that was generated after Mr. Washington's arrest in this particular case. It came into effect in July of 2013, and Mr. Washington was arrested in May of 2013. If we agree with you that you are entitled to discovery, what do you expect to get? Well, Your Honor, we've laid out what we expect to get in that brief, and those are the things that are laid out on page 31 of the brief, which are, for example, all national field office ATF manuals, circulars, field notes, correspondence, or any other materials which discuss stings, reverse stings, phony stash-outs, rip-offs or robberies, or trap-and-operations, cases in the Eastern District of Pennsylvania and New Jersey that involve phony stash-outs, investigations by the ATF. Things that are identified on page 31 and 32 of the brief are what we expect. Is that consistent with Davis' measured approach? It is. Because what Davis and the other cases are concerned about is law enforcement has so much resource that they can't use the resource to help you discover a case. Well, no. So Davis distinguishes between items that pertain to the prosecution of the matter, which is not this case. This pertains to the investigation of the matter. I will agree, going back to your original point about Mr. Washington included both selective prosecution discovery requests, which concededly are not appropriate here, and selective enforcement requests. I have a lot of difficulty distinguishing between the two, prosecution and enforcement. I understand what you're talking about, but to me they meld together. We've limited it here because we're only interested in what happened at the inception of the investigation. Government counsel is correct when he raises the point that oftentimes agents and prosecutors work together to evaluate the investigation. But what we're interested here in a selective enforcement matter is whether or not race was a factor in investigating Mr. Washington in the first instance. What about the idea that the entire idea to rob a stash house came from one of the defendants? It's a fair question. The issue then becomes is would ATF have investigated that if Mr. Washington was white? And that's the point of Davis, because the government in Davis made the same claim. The law enforcement agents determined that because Washington was black and he came to them with the idea to rob a stash house. They agreed to go ahead with the scheme. The difference is, well, that's one point. Or if Washington had been white, whether or not they would have pursued that investigation. It's a hard review to make, but Davis answers the question. It does answer the question, because it's the same issue that was presented to the en banc court in Davis and said, well, that's a consideration. But nonetheless, the ATF might not have investigated Davis had he been white. Well, Washington is serving a sentence at the moment. Twenty-two years. Do you want a discovery to see if you can attack the indictment? Well, we'd like to get the discovery to see if we can attack the indictment. But in addition to that, we'd ask for a new trial on the drug counts that he got 20 years for. Focus on that. We really need that. Do you expect this is a counsel claim? No, no, not that. Law enforcement uses the object of the robbery in order to orchestrate a sentence. The point here is that in order to maintain operational integrity, law enforcement manipulates the cocaine quantity at such levels to serve as an inducement for a defendant to say, okay, I'll go there. Are you agreeing that that's the motive behind jacking it up to 10 kilos? I'm just reporting what the district court said in McLean, and I agree with that. You're saying it's to maintain operational integrity, not to jack up the sentencing. It's two very different things. Well, that's the answer is in order to maintain operational integrity, it also has a consequence of jacking up the sentence. But you're saying your primary point is that it serves as an inducement. It serves as an inducement. And in our case, and this is important, Mr. Washington said that he doesn't crack. He don't F with coke. He doesn't fuck with coke, which is an exclamation, which is a factor. And it goes to show that maybe Mr. Washington doesn't have the ability or the propensity to engage in this type of activity, which is what was found by the district court in McLean. And then he went ahead with it. He knew it was supposed to be cocaine. He said, look, I don't mess with cocaine. But then he went ahead anyhow. Help me with that. Does that undermine your argument in terms of the sentencing manipulation, the sentencing travel, whatever you want to call it, and the impact it had on his conduct and culpability? Well, I can only rely on the district court's analysis in McLean, which basically was focusing on whether or not these types of manipulations of the amount that had no judicial oversight violate the order concept of liberty, which is what the district court found there. There's no way for a court to oversee ATF's artificial manipulation of a cocaine amount in order to induce people to get involved in these crimes. If the individual is not otherwise susceptible to or have a propensity to engage in that type of conduct, the district court found in McLean that it violates substantive due process to sentence him to enhanced mandatory minimums by virtue of the fact that he then takes the bait, for lack of a better description. Ten-year mandatory minimum might have been sufficient. The problem here is that Washington's idea. I mean, he was susceptible. Well, Washington was solicited to participate in this crime by a confederate. Yes. Now, the question that comes is that does that artificial inflation of the cocaine, in order to maintain operational integrity, is that something that this court is going to confidence? If there's no judicial oversight in determining whether or not that is something that a defendant... All right, but you're questioning it from the law enforcement standpoint, so what is your recommendation? Well, my recommendation is that this case be remanded, at least on the third issue, back to the district court with instructions that it is not bound to impose the enhanced 20-year mandatory minimum sentence. Okay. So your first argument is, your first request is to address the sentence? No. The first argument on the third point. I'm sorry? The first argument on the third point is to... Right, well, the third point would be to remand for resentencing on that issue. Ultimately, this is what I'd like to have happen. One is I want to have discovery on the issue number one. The second is... The ATF. The main ATF. That wasn't enough, you think? That was not enough. That's correct. Second is that the court reversed the judgment of conviction on the drug counts for which Mr. Washington got 20 years in jail. Based on what? Ineffective assistance of counsel. All right. And then the third issue is that... The third issue becomes moot if you agree with that. Why? Because the ATF... We don't buy the ineffective assistance. What is the third issue? The third issue, then, is to remand to the district court on the drug sentencing, or resentencing, as to whether or not it is bound to impose the enhanced mandatory minimum sentence. You see, you're playing here with the concepts of whether or not they did anything by making it 10, 20, 100 kilograms or whatever. Whatever they made, they couldn't violate the law of inducing someone to buy the stuff if they weren't already in that frame of mind. They can't convict someone that had no idea of engaging in any illegal activity, and they talked them into doing it. So is it for us to say, no, ATF, you're not to do that high amount because you're making it profitable for people to come into this because the sentencing is something that we have to administer, which is not realistic. Well, it is realistic because the guy did buy into that volume of drugs. Well, he did buy into that volume of drugs. And it wasn't that found that he went into it, but he was improperly induced into it. There's never been any determination that he was overreached, that he was innocent, that they talked him into this. He went into it voluntarily. Well, the issue is whether or not Congress intends for fictitious stash house robbery cases where the ATF artificially sets the amount of drugs, whether the mandatory minimum sentences apply to those types of cases, or whether or not the district court is bound to apply the mandatory minimum, especially the enhanced mandatory minimum in those types of cases. It's unseemly in Washington's view that he'd be sentenced to 20-year mandatory sentence on a case where there was no drugs involved. Well, what you're saying is that he should have been convicted in the first place, but if we're the court of appeals and their conviction is there and it stands, it hasn't been set aside for any reason. I'm not quibbling with the conviction. He's convicted. What I'm challenging is the enhanced mandatory minimum sentence that the district judge feels bound by. I don't know what he might say otherwise. It does sound like a remedy, whether you have 5 kilos, 10 kilos, or 20 kilos. Okay, take that as a given, he was convicted, but you propose a remedy that the district court not be bound by mandatory minimums if that's going to happen. Especially in a phony stash house robbery case under the facts of this case, that's the remedy exactly. I'm not challenging the conviction. Okay, it sounds inviting, but do you have any precedent for that? Yes, in the McLean case. It's not a controlling precedent, but it's... I mean, that is, the district court in McLean, our court in the East District of Pennsylvania, analyzed this question. Now, to be fair to the district court judge, the district court judge in our case did not have the benefit of McLean's second opinion, where the district court judge did not impose the enhanced mandatory minimum. The government didn't appeal that. Pardon me? The government didn't appeal that. Well, that's a good point, Your Honor. The government did appeal initially, and then withdrew the appeal. It wasn't... I didn't always... Well, as far as the record is concerned, there was never an appeal from that determination. Correct. But if we agree with you, and the drug enforcement people set the stash house at 50 kilograms so that everyone bought into it, and we say this is ridiculous that you made this... What amount of drugs do we assign to the conviction, if there's a conviction? I don't think you do as a court of appeals. Well, I think it's the district court. The district court can make a finding of fact with respect to Mr. Washington's individual liability. What amount do they assign to him? Well, that would be a function of fact by the district court. All I'm saying here is that the district court did not do that analysis, forewent that analysis, because he said he was bound to impose the mandatory 20-year enhanced sentence. The court just sentenced him to 3553A. Would he have to assign an amount, or could it just take into consideration the theoretical quantity in terms of assessing culpability, need to deter, those general kinds of concepts, without specifically saying, I'm going to sentence... I'm going to consider 3553A as though there were 100 kilos or 5 kilos, just so... The guy involved is thinking that there was 100 kilos. All right, that's an awful lot of money, that's a heck of an amusement. Maybe that reduces your culpability. But on the other hand, it may also increase your dangerousness, because you were willing to engage in conduct sufficient to take 100 kilograms from the stash house, and you know the kinds of folks who are going to be guarding that kind of drugs. That says something about how dangerous your client is. Or it could just say, I'm going to treat this as though it were 5 kilograms and look at whether or not you did it because you need money for your own treatment or whatever. Just do a 3553A analysis, and that deadline comes you over it. I think that's a thoughtful approach. I agree with that. Because that would dispense with the imposition of an enhanced mandatory minimum sentence. Now then, what would be the grounds for disregarding the guideline? The guidelines or the mandatory minimum sentence? The mandatory minimum. The rationale. The rationale is that the substantive due process claim, the order of liberty claim that was examined by the district court in the claim, that falls in with the whole scope of when Congress imposed or set out the mandatory minimum sentence in statute, did it intend to apply to a phony stash house robbery case where the amount of cocaine is set by ATF to maintain investigation integrity, or did it apply to a case where Congress was intending to ensnare bigwigs, people who are really moving that type of amount of drugs. I mean, we know from experience the perniciousness of these mandatory minimum sentencing statutes, that oftentimes get widows as opposed to the big fish. And some of these defendants are going to jail for extended periods of time. And that's the same as analogous to this case, where you have an artificial case. Let me just ask the flip side of this, the prosecutor side of the question I just put to you. If we focus on the level of culpability of the defendant, why isn't it exactly the same whether or not drugs are there? If I agree directly with an ATF undercover agent or with somebody of mine who's working for them, to quote, take down a stash house, and I think there are 50 kilograms in there, and there aren't 50 kilograms in there. Scenario one, scenario two, same facts, except this time it's a hypothetical stash house, it's a sting, and the drugs don't exist. Isn't my level of culpability exactly the same, my risk to society, whatever it is, exactly the same whether or not the drugs are real? Because I don't know if the drugs are real. I'm still willing to engage in that kind of conduct, as long as you get someone who has not been unduly induced by the agent. Well, I think as a practical matter, if you physically move 50 kilograms of cocaine to the stash house, if ATF does that, it's the same principle. The principle is that the agency is artificially... I'm not talking about them physically putting it in and creating a scenario and going with like an ad scam thing where they put the money in the guy's pocket. I'm saying as a matter of principle, if I agree to rob a stash house that exists, and I'm told that once I rob it there are 50 kilos in there, and there are 50 kilograms in there. Scenario one, scenario two, same thing. I agree to rob a stash house, but it doesn't exist. It's a sting. There are no kilos in there. My culpability is exactly the same. With respect to the robbery. That's the issue. That's right. With respect to the robbery. Not with respect to the attempt to possess with intent to steal the cocaine. Why isn't it? Why isn't it? Whether it exists or not, why isn't my culpability vis-à-vis the drugs exactly the same? Can you be convicted of attempted bank robbery though there's no money in the bank? Yes. Sure. Right. But there's a policy issue. There's a policy issue here. Your Honors, there's a policy issue here. And the policy issue here is do we want to give unbridled discretion to a law enforcement agency to artificially set an amount where then there's no judicial oversight as to whether or not they're going to do it in the future or not. I get that. I'm trying to wrestle with the sentencing implication in terms of the individual offender. That's the point. That's the operative phrase, the individual offender. Right. And that's what McLean addressed. That the individual offender in the claim, the district court said, should not have been given the second enhanced mandatory minimum because his actions, his actions. The only way to get that into a legal framework that seems to work is to then go one step forward and think Judge McLean did it and say Congress could not have intended that result. Congress was after what you're saying thereafter. The person was actually moving a large amount of drugs. But that's different than the quantity I'm having, and that is from a sentencing perspective, the difference in culpability from the two hypothetical defendants, one where the drugs exist, one where they don't exist. And I'm trying to get my mind around a sufficient intellectual distinction to allow for the fact that the drugs don't exist to make a difference in sentencing. That's what I'm trying to wrestle with right now. But I want to get to sentencing first. I want to get to resentencing first. And the question that is involved here initially, the court is addressing step number two. Right. What do I do when I get back to it? Well, that's assuming you win. I understand. But your analysis is what does Judge Slavsky do if this court remands for resentencing? It's purely hypothetical. Hypothetical. It's a philosophical question. Well, in that situation, what I would say to the judge is where Mr. Washington specifically says that he doesn't mess with coke, when Mr. Washington specifically says, I don't move coke. Well, that only applies to your client. It doesn't help the next court to stop him. Well, I'm only interested in my client. Okay. That's all I care about right today. Okay. You know, the big problem I have with your concept here is that it's almost as if the DEA agent has done something wrong. And, therefore, there's some maneuvering that has to be done with the sentencing. But in my mind, the two defendants which Judge McKee has posited, one who's actually involved in an actual stash house and one that's fictitious and made up by the DEA, the mental culpability and the guilt to me is identical, except the guy that is dealing with the DEA agent that made it up, there's no payoff of the actual drugs at the end. But the mental state of whether or not you engage in it willingly, knowingly, and all the guilty factors, the two minds are identical, even though the effect of whether or not there's actually, well, that's what I mean, the effect of whether there's actually drugs there doesn't make any difference. Your Honor, that was the same argument that the government used ages ago to justify the mandatory minimum sentences for crack and explain away the significance of the 100-to-1 difference between 5 grams and 50 grams, or 50 grams that call for a mandatory 10 years and 5 kilograms of powder that call for a mandatory 10 years. Well, the defendant, or possessed of the defendant's tribute, 50 grams of crack. So it doesn't make a difference. I mean, he did it. He had a mental state. It's the same thing here, insofar as where it's a policy issue. It is a policy issue. So the policy issue is whether or not you're going to impose an enhanced mandatory minimum where it's the ATF that has control over the amounts. That's the issue. Sure, the defendant in the 50-gram crack cocaine case, I intended to move that amount of crack, so the jury found, so therefore you have to get 10 years in jail. But we recognize as a policy issue that that was all wrong. So as a result, the Congress then changed the mandatory sentences to increase the amount of crack cocaine that would trigger the mandatory 10-year sentence. That sounds like your best argument, that is that Congress could not have intended that mandatory minimums apply to circumstances involving fictitious drugs. Well, I dare say that when Congress passed the Mandatory Sentences Act for that, they didn't consider that you didn't have the prevalence, as you have today, of these crack house investigations. And that's where the district court stands in. Whatever you have to say that there's a real world out there that you didn't take into account? I think that's where the concept of order of liberty and substantive due process comes in, that a court can step in and say, what you've done, ATF, is a violation of substantive due process. And the problem here is that the district court said it could not do that. The district court here said it was bound to impose a 20-year mandatory minimum sentence, even though Washington argued at sentencing that Congress did not intend for it to apply to these types of cases where the ATF artificially set the amount of drugs. Thank you. Are you going to save some time for a photo? Three minutes. Okay, thanks. I guess there's a distinction in terms of harm to society. If you focus on that, then there's a big distinction. Good afternoon, Your Honors. I'm Eric Henson. I represent the United States. Mr. Lappin didn't come to see you. Mr. Lappin was otherwise engaged. I'm sure he would have given up all entertainment to watch me hanged by Your Honor. I'm sorry you said that. He reckoned that we might be through before now. If I could address what has engaged the court and counsel before I stood up and then go backward with Your Honor's permission, not take the issues in order, the mandatory minimum sentence, you heard a policy argument based on an opinion by a single district judge that Congress didn't mean what it said when it imposed mandatory minimum sentences for certain drug offenses. The distinction that the defense relies on is that there were no drugs here. Could Congress have possibly intended that defendants who could not have completed the crime be sentenced to the mandatory minimums? Well, in these offenses, Section 846, the conspiracy and the attempt, Congress has punished inchoate drug crimes, exactly the drug crimes that were provided for here. There is no general attempt statute under federal law in that great big Title 18. Congress has to provide that attempts will be punished as the principal offense is, which they specifically did here. So they have provided that the impossibility defense, which the defendant relies on to say that Congress didn't really intend the outcome here, would not apply to exactly the crime that Washington committed. In terms of the sentencing issue in McLean, it's a very good response to the discussion that I had with Mr. Greenberg, but it doesn't solve the due process ordered concept of liberty issue raised by Judge McHugh in McLean. You can still take the inchoate approach, justify the statute where nothing exists. It's like driving the bank that's empty. But that doesn't explain whether or not the approach that Congress apparently took or may have taken or inadvertently took is something they intended as a result. And that is sentencing someone who intended to rob some ten kilos where they existed, imposing the same kind of sentencing regime where they did not exist because the level that you could argue anyhow, even though the culpability of the defendant is the same as I discussed with Mr. Greenberg, the harm to society is different. They don't have the same potential for violence because there's not going to be any armed offenders of the drugs there. It's just a much lower threshold in terms of the harm to society, which is any harm to society. The harm to society here, this defendant, contrary to what has been suggested from the record, read most favorably to the defendant, did not say, and the government provides the completed quote at page eight, I think it runs over onto nine of our brief, did not say that he couldn't move the cocaine. In fact, he offered to see to it that the undercover officer who would be returning to New York was able to dispose of and take the profits of the cocaine back to him in New York. I thought what happened was initially he said he doesn't want to mess around with cocaine, and then later on he's talking about moving to New York. It's part of the same quote. I think when the entire quote is laid out, it is clear that what he was saying was I am going to move it quickly. I'm not going to mess with people that may kick back on me. But then he continues the conversation and says not only implicitly can I move my quantity, but I can move your share, Mr. Undercover, because you're not able to move it yourself in Philadelphia and don't want to take it back. There's no question there's massive evidence he's guilty, totally guilty. The only question is, is it order of liberty, due process for a DEA agent to make up a fictitious amount of drugs and then have a defendant sentence based on that fictitious number, which has never been a reality? Or should we just, like McLean, do away with the maximum sentence and get a sentence which is just a reasonable substantive sentence? Whatever Congress intended by mandatory minimums, it intended that they should be mandatory. It's specified in the drug mandatories, the exceptions. And there's no exception for when a judge feels his sense of ordered liberty is offended by the sentence that's required by law. I wonder if they ever thought about surviving the sentence that's required by law assumes the thing you're arguing doesn't exist. It does insofar as it has to do with the mandatory minimum. Your Honor, there is another and an additional framework to sentencing, which is first the guidelines and 3553, which use the guidelines. In this case, the guideline range was 360 to life, 360 months to life imprisonment, because the defendant is a career offender. The judge imposed a sentence of 264 months, a steep variance. If the defendant had been not convicted of the mandatory minimum quantity of cocaine, but a lesser quantity, the guideline range would have been 262 to 327 months. So that not only do we have here a congressional mandate that when a jury returns this verdict that they did, having been asked what quantity is the defendant responsible for, but we also have another sentencing framework in which this case falls, and that is 3553. The sentence imposed, the way the sentencing law works, is the judge arrives at a 3553 sentence. Judge Slomski considered 262 months to be appropriate, considering all those circumstances, and then imposes on individual counts the sentence no greater than the maximum and no less than the mandatory minimum. That's why the 20 years goes on the drug counts. That doesn't address Mr. Greenberg's point, which I think is whether or not the analysis and the approach in McLean might suggest that we conclude that in this scenario, because of the concept of order of liberty and due process implication, that Congress did not intend the mandatory statute to be mandatory. That's what I meant when I said you put the rabbit in the hat by the way you asked the question, because you said Congress intended it to apply, and that's what we're trying to figure out. If this is a question of statutory construction, the statute is clear and unambiguous. It is not ambiguous, and it says exactly what Congress meant as mathematically precisely as any enactment that I'm familiar with. But there's also a canon of statutory construction that says if that text, if the literal unambiguous interpretation of the statute gets you to a, quote, absurd result or result which is so out of the kin of what Congress would have intended, that informs our interpretation of whether or not Congress really intended the statute as it appears to be written. Now, you can argue that this does not get to that level of absurdity, and that's the argument that you'd have to continue to. Your Honor, I do contend that. I'll return to a point made by Judge Cowan that Judge McHugh's government did not continue its appeal of Judge McHugh's sentence, but that's not because we agreed with his analysis or the outcome, but because, as the Court was reminded earlier today, both the United States Attorney's Office and the Solicitor General's Office decides, based on multiple factors, whether to pursue an appeal. And in Judge McHugh's case, interestingly and ironically enough, the jury had a question about what quantity of drugs to attribute to McClain. That was answered with a jury instruction, which the government determined after the fact, having supported what the judge told the jury, was erroneous. The problem I see here is that it is actually law enforcement that, down the road, is going to determine what the sentence will be. And they can have a fictitious 5 kilos, they can have a fictitious 20 kilos. There's a huge difference in the sentence ultimately down the road. They may know who they're dealing with, they may know that the person has a prior record. This is, I think, Mr. Greenberg's point, that maybe that's a violation of the process, and maybe Congress did not intend that result. When it's law enforcement involved directly in determining what the sentence is going to be, it's supposed to go to court. Well, law enforcement didn't determine what the sentence would be. There was a charging decision made by the United States Attorney's Office and the grand jury. The matter then went to court. I understand, I've been to those grand juries. Remind me to see the Attorney's Office, but don't say that the grand jury sat here and said, well, where should we charge this person? And the question of punishment wasn't put to the grand jury. In Judge McHugh's case, and I return to that because I am not aware, and I don't believe that Judge McHugh nor Mr. Greenberg has cited any case where, like the stomach pump case of substance of due process, a sentence which is perfectly lawful within any number of sentencing structures has been set aside. But it is clear that, as the dispositions of other defendants' cases have shown, there are discussions about what the appropriate punishment is. There are the opportunities for non-trial resolutions in which the punishment may be mitigated. In this case, there was an argument to the jury that the defendant shouldn't be held responsible for the total amount that was supposed to be in the drug house. And I submit to the court that I want to return to a point that I slipped off of with respect to Judge McHugh. Judge McHugh entertained in McLean, before trial, first a discovery request, like the one in this case and in Whitfield, and denied it. But he then considered whether there was a due process violation in investigating the case with the made-up amount, and determined, as has every judge who's looked at it, that there was an objective law enforcement purpose having to do with the operation, not with the ultimate sentence, why the quantity was chosen. He made no findings. There's no way to determine whether Judge Slomski considered it. I'm referring back to Judge McHugh's. And Judge Slomski considered also, and that's the appropriate place. The McHugh's point and McLean's point is there is no way, basically when that representation is made, we set this quantity X, because that's the only way to make it credible. That's the quantity that would be in a stash house inside Philadelphia. That's basically being proffered in the nature of an expert witness, otherwise not under the federal rules. And there's no way to counter that. There's no way to test it. There's no way to probe it. There's no way to get at, well, does that mean that all stash houses have to operate above a certain level of product or inventory? And once they get below inventory, they just shut down. So we only got 9.8 kilos in the house today. We've got to shut down. Let's get this out of here until we can get enough in inventory to get back to 10 kilos. Then we'll bring it back and we can operate again. Those kinds of things that seem to make the quantity of 10 kilos arguably arbitrary. There's no way to test that. There's no way to probe it. And that was part of his concern in his 14th Amendment analysis. It has been probed. In each of the cases, the agents have been examined under oath, cross-examined by lawyers making exactly this claim, that their clients' due process rights were violated by that choice. And every judge who has looked at it has determined that there was a legitimate basis. There was no for the choice. What were the legitimate basis that were given? The credibility of the operation, that is, is it credible that the courier from New York would be involved in stash houses that have a certain amount of drugs, the safety of the officers, of the undercover agent and the confidential informant. How does the safety pertain to quantity? What's the relationship? Because if the undercover operation is blown, is read by the subjects of it as what it is, it endangers both. You're saying if you say 9 kilos, that suggests this is a sting, where 10 kilos suggests it's legit. That's what you're saying? In Philadelphia. And if you look across the country, the quantities have ranged from, I don't recall reading any below 5 kilograms, 20, 50, 100. It is clear that different circumstances are evaluated in different ways, not pinned to the sentencing outcomes. Because unless the operations succeed, the question of sentencing, which ultimately is for the court, doesn't arise at all. Maybe you can take some time to relay this on, but Mr. Gingrich's first argument, and that is the discovery, David versus Armstrong, and how is the defense attorney, how is the court to get at the possibility, and I think you can see that's a possibility, maybe you wouldn't if you wouldn't let me know, the possibility that these stings may be set up in a way that is racially discriminatory. The same thing would happen in Ardmore or Chestnut Hill. The agent would say, well, let's take too much time and effort to put this case together. Let's go to a facility where we can put a case together and get some folks interested with a lot less effort. I think the agents have worked this case, and the attorneys in the United States Attorney's Office would have loved to find a case in Chestnut Hill that could have worked this way. Well, if you hang around in Chestnut Hill Academy, you may not have to wait for one. I just went through there, and I won't get into that, but I don't know what's being done. If they would love it, I don't have any resources there for you to do that. If I may address, the case on which the defense relies is Davis out of the Seventh Circuit. Davis was before this court's panel in Whitfield, and Whitfield nonetheless, and the quote is at page 37, note 12, maintained that there is no legally significant distinction between enforcement and prosecution for these purposes. We have a door open in Whitfield. We distinctly have a door open. It did, but a very carefully crafted opinion directly discussed it and did not accept the distinction, and I submit that it is a distinction that should not be accepted in these circumstances. Davis, which is the case on which the defense relies, was a government appeal where the discovery that this defendant and the Whitfield defendants asked for was ordered in the district court. When the government refused to comply, the case was dismissed, the government appealed, and the Seventh Circuit in that context, having found that the discovery order was overbroad, considered also that the defendants in Davis, unlike the defendant here, claimed to have evidence that a white person in Davis' position would not have been investigated and prosecuted. The Seventh Circuit very carefully said, let the district court, directed the district court to look at that evidence and then make a determination whether any discovery at all further than that should occur and also very carefully suggested that the place to turn, should this evidence that the defendants claimed to have be produced, to examining the agents, all of whom in our case had been examined in pre-trial hearings and at trial. So Davis, although we believe that it unwisely, imprudently, and unnecessarily evades Armstrong, does not stand for anything that would permit this defendant additional discovery. Armstrong focused on prosecutorial discretion, didn't he? He did. And Davis on law enforcement. I'm sure it evaded Armstrong, it just focused on a different aspect of government. And it focused on an entirely different record from the record that was available in Armstrong, in Bass, in the Tenth Circuit case that has considered this law enforcement versus prosecution distinction, in Hare, in the Fourth Circuit where the district judge permitted the discovery that Judge Slomski ultimately permitted here, but then denied any additional discovery on the selective enforcement claim. In the federal context, and the Seventh Circuit in a case that isn't mentioned in Davis, as I recall, looked at a law enforcement issue, that is the way DEA was targeting passengers going through whatever the name of the train station in Chicago is, and did not distinguish between law enforcement and prosecution. And in the federal context especially, the activities run together. For example, in this case we know that conversations between the confidential informant and the agent and the subjects of the investigation were recorded. An assistant United States attorney has to give that approval. Frequently, not in the record, but I know in this case because I was the one who did it, when a person on supervision asks to cooperate, the government, represented by the United States Attorney's Office, goes to the district judge, Judge Padova in this case, to get permission with the probation office who is supervising the person for the person to work with the agency. Hard to separate the two, I guess. As we go along, it is part and parcel, as I think is articulated well in our brief, I don't take credit for that because I wasn't the author of that description, that the processes are intertwined and they're inextricably intertwined. And the reasons for Armstrong in prosecutor's offices apply equally to the enforcement agencies. The answer to my question? It may be more than answering your question. I will retire whether there are additional questions or not. Thank you. Thank you. I know it's getting late. Let me just make two points. Because in order to maintain operational integrity in Philadelphia, you need more cocaine than in Ardmore or some other place. That betrays the government's position as to whether or not this is a constitutional violation. Why should a defendant be exposed in Philadelphia to more mandatory minimum sentences or even a mandatory minimum sentence? Because the DEA says in order to maintain operational integrity in Philly, I've got to have more cocaine than if I maintain operational integrity in Ardmore or some other location. The point, too, I'd like to make is, regarding Judge Cowen's characterization of this case as involving overwhelming evidence, Your Honor, please don't lose sight of the fact that Mr. Washington was acquitted of the 924C count. So everything that we're talking about here, about the facts and what was on the tape, the jury took that into account. Had he been convicted of 924C, then you could say it's an overwhelming case. But because he was acquitted, it's not so much. Not only that, but you've got two separate and distinct criminal offenses here. One is the Hobbs Act robbery, and the second is the drug distribution counts. He gets 20 years in the drug distribution counts. He gets two years in the Hobbs Act robbery. Yes, maybe the evidence is overwhelming with respect to the Hobbs Act robbery. Well, the problem is that really, in effect, your argument really is asking us to judicially amend the sentencing statute. This is really in the context of the ineffectiveness of the counseling. Oh, no, I'm talking about the effect of drugs. I'm not talking about the ineffectiveness. That's just fine. But as far as the sentencing, I understand. I don't like the idea that the EAH says, well, we'll make it $100,000. We'll make it $100,000. Give me ideas about that. If we get up there, everyone's going to get it. But it doesn't sit right with me. But we're bound by the law, of course, and the law is that to be convicted of X, you give them Y. And you're, in effect, saying, well, we should amend that and say if the amount it was convicted of was a fiction created by DEA, we should judicially say, just go to the 3553 and call it a day. Well, I misread your comment there. Yeah. Okay. Those are the two points I had. Thank you. Thank you. Excellent argument. Thank you very much. Thank you. Tell Mr. Lappin he did well. I will, Your Honor. He may accept. Okay. He may not believe you. This court is adjourned until Thursday. Everybody may be seated.